<u>Michael Vito et al. v. Candace Grueff</u>, No. 75, September Term, 2016

**TRUSTS – TRUST INTERPRETATION – INTENTION OF SETTLOR –** Court of Appeals held that modification authority contained in irrevocable trust did not permit 75% of beneficiaries to divest remaining beneficiary.  Court of Appeals reaffirmed that, when interpreting trust, intent of settlor is paramount and deduced from entire trust document. Court of Appeals held that, where settlor plainly intended trust to benefit his four children equally, modification authority could not be used by three of beneficiaries to remove fourth beneficiary.

Circuit Court for Montgomery County
Case No. 380035-V

Argued: March 31, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 75

September Term, 2016

_____

MICHAEL VITO ET AL.

v.

CANDACE GRUEFF

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Getty,

JJ.

_____

Opinion by Watts, J.

_____

Filed: May 22, 2017

This case involves four siblings who were beneficiaries under an irrevocable trust that was established by their father, the trust's settlor.[1] Three of the four siblings attempted to remove the fourth sibling as a beneficiary of the irrevocable trust by relying on a provision of the irrevocable trust that permitted 75% of the beneficiaries to amend the terms of the trust.

In this context, we are asked to decide whether the modification authority that is granted to the beneficiaries of a trust may be used to divest one of the beneficiaries from benefits of the trust where the trust was explicitly established to benefit all beneficiaries equally. Here, the settlor established an irrevocable trust for the benefit of his four adult children. Included in the trust instrument is a modification provision that provides authority for the beneficiaries to alter, amend, or revoke the terms of the trust if 75% of the beneficiaries vote in favor of such action. The modification provision did not specifically grant authority to remove a beneficiary, but rather allowed 75% of the beneficiaries to alter, amend, or revoke the terms of the trust pursuant to the terms of the modification provision. Thirty years after the trust was created, three of the four beneficiaries executed an amendment under the modification provision purporting to remove the fourth beneficiary as a beneficiary of the trust.

Considering the language of the entire trust instrument, we hold that the plain language of the modification provision does not grant authority for three beneficiaries of

[1]A settlor is "[s]omeone who makes a settlement of property; esp[ecially], one who sets up a trust. — Also termed *creator, donor, trustor, grantor, founder*." Settlor, Black's Law Dictionary (10th ed. 2014) (italics in original).

the trust to remove the fourth beneficiary, and that the irrevocable trust clearly evinces the settlor's intent for the trust to benefit his four children—the four beneficiaries—equally. An interpretation of the trust instrument that would permit three of the settlor's children to divest the fourth would contravene the settlor's intent and be inconsistent with the plain language of the irrevocable trust. We conclude that the amendment at issue—in which three of the four beneficiaries purported to divest the fourth beneficiary—was impermissible under the terms of the irrevocable trust.

## BACKGROUND

On September 16, 1983, James Vito ("Vito") established an irrevocable trust, entitled the "James B. Vito Family Trust" ("the irrevocable trust"), naming his four children, Michael Vito ("Michael"), Judith Vito Seal ("Judith"), John Timothy Vito ("Timothy"), and Candace Vito Grueff ("Candace") (together, "the beneficiaries"), as beneficiaries.[2] At the time, Vito owned a contract to purchase property improved by a building in Rochester, New York. The preamble of the irrevocable trust states that Vito intended to give the contract to purchase property to the trust as a gift "for the immediate benefit of [Vito's] children, namely, CANDACE VITO GRUEFF, JUDITH A. VITO, MICHAEL A. VITO, and JOHN T. VITO (hereinafter referred to as the 'Beneficial Owners' or 'Beneficiaries') of the fee interest in said property in which [Vito was] the owner of all buildings and improvements thereon[.]" The preamble further provides that Vito granted "all [Vito's] right, title and interest in and to the fee interest in said property .

---

[2]Due to the common surname, we refer to James Vito as "Vito" and to his wife and children by their first names.

. . in equal shares, for [Vito's] children, CANDACE VITO GRUEFF, JUDITH A. VITO, MICHAEL A. VITO, and JOHN T. VITO," thereby establishing "a Trust Fund subject to the terms and conditions [therein] under which the Trustee agree[d] to hold said fund . . . for the benefit of and in behalf of [Vito]'s said children[.]"

Following the preamble, the irrevocable trust sets forth fifteen individually numbered items, including, in relevant part:

> SECOND: The Settlor shall pay all transfer or recordation taxes and costs of settlement and title insurance on the purchase of the subject property and thereafter the Trustee shall hold the legal title to Trust Property subject to the Bill of Sale, Lease and Memorandum of Gift between the parties and shall collect and receive all payments coming due on account thereof, whether rents, dividends, interest and/or principal in behalf of and for the benefit of the beneficiaries and the Trustee shall pay out of sums collected on such assets, first out of income, and to the extent necessary from principal, all taxes and other proper charges of the administration thereof. In addition, the Trustee shall at least once each year distribute all the net income and any capital gains of the trust to the beneficial owners in the shares set forth in Item SIXTH below in such partial or periodic distributions as he deems appropriate within his discretion.

\* \* \*

> FOURTH: This Trust shall terminate sixteen (16) years from the date hereof unless sooner terminated as hereinafter provided (unless the Settlor-Tenant exercises his option to renew the Lease for ten (10) years, in which case the term of the Trust shall also be extended). Upon the termination of this Trust, whether at the end of said sixteen (16) years or prior thereto (or after expiration of the option period) the Trust Estate then held by the Trustee shall be paid over, transferred and delivered to the beneficiaries in the shares set forth in Item SIXTH below, free of all Trusts.

\* \* \*

> SIXTH: If at any time the assets comprising the Trust estate shall have been liquidated and all of the aforesaid assumed obligations or liens or encumbrances on the Trust property have been satisfied, the Trustee shall, after setting aside an amount which in his judgment will be sufficient to

- 3 -

provide for the payment of any taxes and/or costs of administration, pay over and distribute the remaining assets, exclusive of the reserve for taxes and/or costs, to the beneficiaries free of all Trust, in the shares listed below:

| | |
|---|---|
| CANDACE VITO GRUEFF | 25% |
| JUDITH A. VITO | 25% |
| MICHAEL A. VITO | 25% |
| JOHN T. VITO | <u>25%</u> |
| | 100% |

\* \* \*

EIGHTH: In the event of the death of any of the issue of Settlor, prior to the termination of this Trust, the beneficial interest herein of such deceased person shall pass to his or her estate.

\* \* \*

TENTH: This Agreement may be revoked, altered or amended from time to time by an instrument in writing, signed by the holders of not less than seventy-five (75%) interest herein and delivered to the Trustee.

Prior to the amendment at issue in the instant case, the irrevocable trust had been amended four times, pursuant to the protocol set forth in Item Tenth requiring consent of 75% of the beneficiaries to alter, amend, or revoke the terms of the irrevocable trust. Specifically, in 1995, Judith, Michael, and Timothy first amended the irrevocable trust to appoint John F. Brennan, Esquire ("Brennan") as the successor to the original trustee, Paul Vito ("Amendment I"). In 1999, all of the beneficiaries—Judith, Michael, Timothy, and Candace—amended the irrevocable trust to extend its duration until Vito's death or December 31, 2019, whichever occurred first ("Amendment II"); pursuant to Item Fourth, the irrevocable trust was originally intended to expire after sixteen years. In 2003, all of

- 4 -

the beneficiaries extended the trust termination date to December 31, 2024 ("Amendment III"). In Amendment III, the beneficiaries empowered the trustee to enter into certain indemnification agreements on behalf of the trust. In 2012, Judith, Michael, and Timothy amended the irrevocable trust to appoint Judith and Michael as successor trustees to Brennan ("Amendment IV").[3]

In the midst of the amendments, the beneficiaries became embroiled in litigation. In 1999, Vito created a separate, revocable trust ("the revocable trust"), identifying himself, his wife, Mary Vito ("Mary"), and Brennan as the trustees. The revocable trust was funded by Vito's commercial real estate holdings and other property. On December 15, 2004, Vito executed an amendment to the revocable trust restating its terms. The amended revocable trust established a residuary trust, separate from a marital trust, under which Vito's four children had an interest. In April 2011, Vito amended the revocable trust as the settlor, and Vito, Mary, and Brennan amended the revocable trust as trustees, specifying that Candace's 25% interest in an entity known as James Properties II, LLC would be reduced by a 10% interest that had been previously granted to Candace's son. Each of Judith, Timothy, and Michael retained a 25% interest in James Properties II, LLC. Candace subsequently filed a guardianship proceeding, alleging that Vito had dementia, that Michael and Judith had taken advantage of Vito, and that Michael and Judith had convinced Brennan to draft the amendment without informing Vito and Mary of its implications.[4] The parties settled the

---

[3]Amendment IV was the fourth amendment to the irrevocable trust, but was erroneously entitled "Amendment III."

[4]Michael and Judith do not concede that Vito was incompetent as a result of dementia. Vito was never declared incompetent by a court.

guardianship matter with the appointment of Paul H. Ethridge, Esquire ("Ethridge") and Mary as co-guardians of Vito's property.

On August 9, 2013, with respect to both the irrevocable trust and the revocable trust, Candace, Respondent, filed in the Circuit Court for Montgomery County ("the circuit court") a "Complaint to Remove Trustees, For Breach of Fiduciary Duty, to Appoint Successor Trustees, For Negligence, For Monies Had and Received, To Set Aside Improper Conveyances and For an Accounting and Other Relief, Including Money Damages" against Mary in her capacity as a co-guardian of Vito's property, Ethridge in his capacity as a co-guardian of Vito's property, Michael, Judith, Timothy, Brennan, and MFV Annuity Fund, LLC. In the complaint, Candace alleged that Michael and Judith, Petitioners, were misallocating funds from both trusts. Candace requested that the circuit court remove Michael and Judith as trustees of the irrevocable trust and appoint a successor trustee. Candace also sought, among other things, to require Michael and Judith to provide a full accounting of any funds taken from the trusts.

On October 21, 2013, subsequent to the filing of Candace's complaint, pursuant to the modification provision of the irrevocable trust—Item Tenth—Judith, Michael, and Timothy executed the amendment to the irrevocable trust purporting to remove Candace as a beneficiary under the irrevocable trust. This was the fifth amendment ("Amendment V") to the irrevocable trust, which provides:

> Pursuant to Article [(Item)] Tenth[5] of the JAMES B. VITO FAMILY TRUST, dated September 16, 1983, as amended by Amendment I to the

---

[5]The parties refer to Item Tenth, as well as other provisions of the irrevocable trust, as both "Item" and "Article." For consistency, we refer to a trust provision as an "Item."

James B. Vito Family Trust dated March 8, 1995, and as further amended by Amendment II to the James B. Vito Family Trust dated September 1, 1999, Amendment III to the James B. Vito Family Trust dated June 16, 2003, and a fourth amendment incorrectly identified as Amendment III to the James B. Vito Family Trust dated May 21, 2012 (collectively, the "Trust"), the undersigned, being seventy-five percent (75%) of the beneficial owners of the Trust, hereby amend the Trust as follows:

1. [Item] Sixth is hereby deleted in its entirety and replaced as follows:

SIXTH: If at any time the assets comprising the Trust estate shall have been liquidated and all of the aforesaid assumed obligations or liens or encumbrances on the Trust property have been satisfied, the Trustee shall, after setting aside an amount which in his judgment will be sufficient to provide for the payment of any taxes and/or costs of administration, pay over and distribute the remaining assets, exclusive of the reserve for taxes and/or costs, to the beneficiaries free of all Trust, in the shares listed below:

JUDITH VITO SEAL     33 1/3%

MICHAEL A. VITO     33 1/3%

JOHN T. VITO     33 1/3%

All other terms and conditions of the Trust shall remain unchanged and continue in full force and effect.

This Amendment may be executed in counterparts, each of which, when so executed, will be deemed an original, and all of which, taken together, shall constitute one instrument.

Less than two weeks later, on November 1, 2013, Judith and Michael filed in the circuit court a "Motion to Dismiss and/or For Summary Judgment" as to Counts I and V, which pertained to removal of Michael and Judith as trustees of the irrevocable trust and the request for an accounting of their dealings with regard to the irrevocable trust. In the motion, Michael and Judith claimed that Candace lacked standing to challenge their appointment as trustees because she was no longer a beneficiary of the irrevocable trust,

contending:

> Finally, pursuant to Amendment V to the James B. Vito Family Trust ("Amendment"), attached hereto as **Exhibit 1**, [Candace] is no longer a beneficiary, income or otherwise, of the [irrevocable] Trust. The Amendment amended [Item] Sixth of the Family Trust, which controls the disbursement of current income and proceeds upon the termination of the [irrevocable] Trust. Although when suit was filed, [Candace] was an income beneficiary and a one-fourth (1/4) remainder beneficiary, on October 21, 2013, pursuant to [Item] Tenth of the [irrevocable] Trust, three-fourths (3/4) of the beneficial owners agreed to modify [Item] Sixth, replacing it with a new [Item] Sixth. [Candace] is not an income beneficiary under the new [Item] Sixth as of October 21, 2013. Thus, since she is no longer a current income beneficiary of the [irrevocable] Trust nor a residual beneficiary, she lacks standing to bring her request for removal of Michael and Judith as Trustees.

(Bolding in original). Similarly, Michael and Judith argued that Candace lacked standing to request an accounting of any transaction involving the irrevocable trust that occurred after October 21, 2013, the date on which Amendment V was executed. In addition to the motion to dismiss and/or for summary judgment that Michael and Judith filed, there were two other motions to dismiss Candace's complaint filed: one by Timothy and MFV Annuity Fund, LLC, and a second by Mary and Brennan.

On December 19, 2013, the circuit court conducted a hearing on the motions. On January 27, 2014, the circuit court issued an opinion and order granting all of the motions to dismiss, including Michael's and Judith's motion to dismiss and/or for summary judgment. In ruling on Michael's and Judith's motion, the circuit court found that Candace lacked standing to bring her claims. Specifically, the circuit court concluded that Item Tenth could be used to remove a beneficiary from the irrevocable trust; thus, by virtue of Amendment V, Candace was no longer a beneficiary with standing to seek removal of

- 8 -

Michael and Judith as trustees of the irrevocable trust, and to seek an accounting for transactions that occurred after October 21, 2013. The circuit court also found Item Tenth "to be a valid and enforceable contractual provision."

On February 5, 2014, Candace filed a motion to alter or amend the circuit court's judgment. On May 8, 2014, the circuit court held a hearing on the motion to alter or amend. During the hearing, the circuit court clarified that its order granting Michael's and Judith's motion to dismiss and/or for summary judgment was partial. On the same day as the hearing, the circuit court issued an Order Amending Opinion and Order docketed on January 29, 2014, in which the circuit court explained "that only partial summary judgment has been entered in favor of the defendants, Michael [] and Judith [], on Count V of [Candace]'s complaint, and [Candace]'s claim for an accounting for the period of time up to October 21, 2013, shall remain pending." On November 3, 2014, the parties filed a line of dismissal, asking that the remaining pending counts of the complaint be dismissed with prejudice. Two days later, on November 5, 2014, Vito died.

On November 7, 2014, Candace noted an appeal to the Court of Special Appeals. On August 31, 2016, in a reported opinion, the Court of Special Appeals reversed, in part, the circuit court's judgment, by reversing the dismissal of Counts I and V, which pertained to removal of Michael and Judith as trustees of the irrevocable trust and the request for an accounting of their dealings with regard to the irrevocable trust, and otherwise affirmed the circuit court's judgment. See Grueff v. Vito, 229 Md. App. 353, 385, 145 A.3d 86, 104 (2016). The Court of Special Appeals held "that a broadly worded power to amend in an irrevocable trust instrument cannot be used by a majority of beneficiaries to divest a

minority beneficiary of her interest in the trust when doing so would be contrary to the settlor's intent in creating the trust." Id. at 356, 145 A.3d at 87. Specifically, the Court of Special Appeals observed that interpreting the irrevocable trust to allow three of four siblings to divest the fourth would contravene Vito's clearly stated intent, which was to benefit his four children equally. See id. at 373, 145 A.3d at 98. The Court of Special Appeals stated: "When the [irrevocable] trust instrument is considered as a whole, a reading of [the 75% rule] to allow the holders of a 75% interest, *i.e.*, three children, to divest the holder of the remaining 25% interest, *i.e.*, one child, of that interest is inconsistent with [Vito]'s clear intention to benefit all four of his children, and to do so equally." Id. at 373, 145 A.3d at 98. Thus, the Court of Special Appeals reversed the circuit court's judgment as to Counts I and V with respect to Michael and Judith. See id. at 385, 145 A.3d at 104.

On October 14, 2016, Michael and Judith filed in this Court a petition for a writ of *certiorari*, posing the following question:

> Whether the [Court of Special Appeals] erred in reversing the Circuit Court and ignored the intent of the settlor, as expressed in the plain and unambiguous language of the Trust instrument, by holding an amendment clause cannot be used to modify the beneficiary section of the Trust, even though the amendment complied with the plain language of the amendment clause?

On December 2, 2016, we granted the petition. See Vito v. Grueff, 450 Md. 664, 150 A.3d 819 (2016).

## DISCUSSION

### The Parties' Contentions

Michael and Judith contend that the Court of Special Appeals's decision, reversing the judgment of the circuit court as to Counts I and V, was not based on established Maryland law, but rather was fashioned to avoid an "undesirable result"—the divestment of Candace. Michael and Judith argue that the Court of Special Appeals failed to give the language of Item Tenth its plain meaning, which, in their view, grants the beneficiaries broad discretion to modify the irrevocable trust, including the authority to divest a beneficiary. Relying on principles of contract interpretation, Michael and Judith assert that the Court of Special Appeals was prohibited from considering provisions outside of Item Tenth unless the Court determined that the language of Item Tenth was ambiguous. Michael and Judith maintain that, in rejecting the use of the 75% rule to amend Item Sixth, the Court of Special Appeals substituted its judgment for Vito's clearly stated intent.

Candace responds that the Court of Special Appeals correctly determined that Michael's and Judith's interpretation of Item Tenth contravened Vito's intent, which was to have the irrevocable trust benefit his four children equally. Candace contends that the Court of Special Appeals properly considered the language of the irrevocable trust in its entirety in determining the scope of Item Tenth. According to Candace, language throughout the irrevocable trust demonstrates that Vito intended the irrevocable trust to benefit all four children and, thus, any amendment divesting one child would contravene that intent. Candace argues that Amendment V violates well-established Maryland law regarding testamentary power of appointment, which prohibits beneficiaries from

unilaterally taking a greater share of trust property for themselves.

In reply, Michael and Judith contend that Vito's intent, as expressed in the irrevocable trust, comports with their interpretation of Item Tenth. Michael and Judith argue that, considering the irrevocable trust as a whole, nothing contained therein contradicts the validity of the divestment of Candace under Item Tenth. Michael and Judith assert that Item Tenth provides for broad amendment authority that is to be exercised by 75% of the beneficiaries. Michael and Judith maintain that any amendment to the irrevocable trust, including the first four amendments, would alter its original intent. Michael and Judith contend that Candace's objection to their use of Item Tenth stems from the circumstance that the modification achieves an obviously undesirable result for her, rather than from any legal shortcoming of the amendment.

**Standard of Review**

We treat the circuit court's grant of the motion to dismiss and/or for summary judgment as a motion for summary judgment, as the circuit court considered materials outside of the pleadings—namely, the irrevocable trust and Amendment V. See Anne Arundel Cty. v. Bell, 442 Md. 539, 552, 113 A.3d 639, 647 (2015) ("We will treat the Circuit Court's grant of the County's motions to dismiss as a grant of summary judgment because the trial court considered materials (specifically, affidavits) outside the complaints (i.e., the complaints and documents attached thereto)." (Citations omitted)). We review all questions of law, including whether summary judgment was properly granted, without deference. See id. at 552, 113 A.3d at 647; see also Toms v. Calvary Assembly of God,

Inc., 446 Md. 543, 551, 132 A.3d 866, 870-71 (2016) ("As with all questions of law, we review this matter *de novo*." (Citations and internal quotation marks omitted)).

## Relevant Law

"The creation of a trust is a means of providing benefits for another, sometimes for a consideration but more generally as a donative transfer. . . . The intent to create a trust must be definite and particular." Amy Morris Hess et al., Bogert's Trusts and Trustees ("Bogert's") § 46 (2016) (footnote omitted). At common law, there is a presumption that beneficiaries do not possess the power to modify a trust. See Bogert's § 992 ("Although a beneficiary may be expressly granted the power to amend the trust, at common law, neither some nor all of the beneficiaries have an implied power to modify the trust." (Footnotes omitted)). A settlor may, however, affirmatively grant a beneficiary the power to amend the trust. See id. Similarly, a trustee may not unilaterally amend a trust without the consent of the beneficiaries, except as expressly provided in the trust instrument. See From the Heart Church Ministries, Inc. v. African Methodist Episcopal Zion Church, 370 Md. 152, 184, 803 A.2d 548, 568 (2002) ("Once established, a trust may be modified without the beneficiaries' consent, but only if the power to do so is reserved. If no such right has been reserved, then the beneficiaries' consent is required before the trust may be modified." (Citation omitted)); Shriners Hosps. for Crippled Children v. Md. Nat'l Bank, 270 Md. 564, 581, 312 A.2d 546, 555 (1973) ("[T]rustees cannot alter the interests of the beneficiaries without their consent[.]" (Citation omitted)).

Conversely, courts may amend a trust if doing so would best effectuate the settlor's intent:

- 13 -

> Courts . . . have the inherent power to modify a trust so long as that authority is exercised with caution and not employed merely as a tool or device to enable beneficiaries to receive a greater income or use of trust property than was intended by the settlor. Before a court utilizes the inherent power of modification, it must first be satisfied that facts and circumstances exist that could not have been foreseen by the testator and that as a result of that lack of foresight, the beneficiary will suffer loss.

Probasco v. Clark, 58 Md. App. 683, 687-88, 474 A.2d 221, 223 (1984) (citations omitted); see also Shriners Hosps., 270 Md. at 581, 312 A.2d at 555 ("[A] trust instrument may be reformed by the court to correct a mistake in the exercise of an equity court's inherent power." (Citations omitted)); Md. Code Ann., Est. & Trusts (1974, 2011 Repl. Vol., 2014 Supp.) ("ET") § 14.5-413 ("The court may reform the terms of a trust, even if unambiguous, to conform the terms to the intention of the settlor if it is proved by clear and convincing evidence that both the intent of the settlor and the terms of the trust were affected by a mistake of fact or law, whether in expression or inducement.").[6] "This power of the court to modify does not extend to altering the dispositive provisions by introducing new beneficiaries, or removing old ones, or changing the shares of the beneficiaries." Bogert's § 994 (footnote omitted).

When interpreting a trust, "[o]ne of the fundamental rules of construction is that the intention of the [settlor] must govern if consistent with the rules of law, and this intention

---

[6]In 2014, the General Assembly enacted the Maryland Trust Act ("the Trust Act"), which took effect on January 1, 2015. 2014 Md. Laws 3876, 3969 (Vol. V, Ch. 585, H.B. 83). The provisions of the Trust Act "appl[y] to all trusts created before, on, or after January 1, 2015[.]" ET § 14.5-1006(a)(1). The Trust Act "do[es] not apply to judicial proceedings concerning trusts commenced before January 1, 2015[.]" ET § 14.5-1006(a)(3). However, "a rule of construction or presumption provided in [the Trust Act] applies to trust instruments executed before January 1, 2015, unless there is a clear indication of a contrary intent in the terms of the trust[.]" ET § 14.5-1006(a)(4).

must be gathered from the entire instrument." <u>Sands v. Church of Ascension and Prince of Peace</u>, 181 Md. 536, 541, 30 A.2d 771, 774 (1943). Courts generally employ the following methodology to ascertain the intent of the settlor:

> The process of construction of trust provisions is the same as that used in the construction of wills, and essentially involves three steps. The premise is that the intent of the settlor or testator controls. That intent is first sought by careful examination of the language of the trust clause in question, giving the words in that clause their ordinary meanings. If the question cannot be resolved by reference to the clause alone, the court will examine the entire trust instrument to determine the settlor's intent and purposes; where necessary they apply statutory or court rules of construction or presumptions. The third step becomes necessary when the intent or meaning of the settlor or testator cannot be determined by reference to the provisions of the trust instrument itself, for example, if the language is ambiguous. Then, the court admits extrinsic evidence to assist it in determining the meaning and effect of the particular clause.

Bogert's § 182 (footnotes omitted). Because the rules of construction for trusts are the same as those for wills, we find this Court's case law interpreting wills to be instructive.

As with the interpretation of trusts, "[w]hen construing a will, the paramount concern of the court is to ascertain and effectuate the testator's expressed intent." <u>Friedman v. Hannan</u>, 412 Md. 328, 339, 987 A.2d 60, 67 (2010) (citation and internal quotation marks omitted). Indeed, we have explained that effect must be given to the express meaning of the testator's words, rather than what the court might presume the intent of the testator to be. <u>See</u> <u>Banghart v. Vieweg</u>, 261 Md. 214, 220-21, 274 A.2d 333, 336 (1971) ("(A)rguments based upon the supposed or known wishes of a testator in respect to the disposition of his [or her] property are not to be considered, unless such wishes are expressed in his [or her] will." (First alternation in original) (citation and internal quotation marks omitted)). Furthermore, extrinsic evidence is inadmissible unless it clarifies an

- 15 -

ambiguous testamentary intent:

> As far back as <u>Walston v. White</u>, 5 Md. 297 (1853), Chief Judge Le Grand said for our predecessors:
>
> 'The rule is this: where the language of the testator is plain and unambiguous such language must govern, and therefore extrinsic evidence is inadmissible to show that he [or she] meant something different from what his [or her] language imports; but any evidence is admissible, which, in its nature and effect, simply explains what the testator has written; 'in other words, the question in expounding a will is not (-W)hat the testator meant? as distinguished from (-W)hat his [or her] words express(?) but simply (-W)hat is the meaning of his [or her] words?
>
> . . .
>
> In <u>Hebden v. Keim</u>, 196 Md. 45, 75 A.2d 126 (1950), Judge Delaplaine said for the Court:
>
> 'We recognize, of course, that the Court, in construing a will, is governed, not by what the Court may think the testator wanted to say, but by what his [or her] words actually meant, because his [or her] words were designed to express his [or her] intention. The expressions in a will must be interpreted in their ordinary and grammatical sense; and if the language is plain and unambiguous, the Court cannot give it a different meaning in order to give effect to a mere conjecture as to the testator's intention.'

<u>Banghart</u>, 261 Md. at 218-19, 274 A.2d at 335 (some alterations in original) (some citations omitted). Where provisions of the same will appear to contradict one another, the Court of Special Appeals has concluded that "the provision which most nearly appears to be in accord with the testator's wishes should prevail." <u>Bell v. Forti</u>, 85 Md. App. 345, 352, 584 A.2d 77, 80 (1991) (citation omitted). Accordingly, "a specific will provision should prevail over or modify a general provision" and "[t]he testator's general intention prevails over minor discrepancies, omissions, or contradictions in the will." <u>Id.</u> at 352, 584 A.2d at 81 (citations omitted).

- 16 -

We have consistently adhered to the principle that, when determining the fate of a testamentary estate, the testator's intent is of primary importance and must be divined from the four corners of the will. See Pfeufer v. Cyphers, 397 Md. 643, 651, 919 A.2d 641, 646 (2007) ("[U]nless prohibited by statute or public policy, the intent of the testator as ascertained from the four corners of the will controls the disposition of a decedent's estate." (Citation and internal quotation marks omitted)); Bandy v. Clancy, 449 Md. 577, 597, 144 A.3d 802, 814 (2016) ("When construing a will, our emphasis . . . is ascertaining and effectuating the intent of the testator[.]" (Citation omitted)). In Pfeufer, 397 Md. at 660, 919 A.2d at 652, we held that a testator's clearly stated intent that an inheritance tax on the estate be paid from the residuary estate "without apportionment" was controlling, even though a number of the residuary legatees would ordinarily be exempt from paying inheritance taxes on their share. In Pfeufer, id. at 646, 919 A.2d at 643-44, the testator's will provided that the residuary estate be divided in equal shares among four individuals: his daughter, his son, his sister, and a fourth individual who was of no relation. Pursuant to Md. Code Ann., Tax-Gen. (1988, 2004 Repl. Vol.) ("TG") § 7-203(b)(2), the three relatives of the testator were exempt from paying inheritance taxes, but the fourth legatee did not qualify for such an exemption.[7] See Pfeufer, 397 Md. at 646-47, 919 A.2d at 644. The will, however, included the following language:

---

[7]TG 7-203(b)(2) provided:

The inheritance tax does not apply to the receipt of property that passes from a decedent to or for the use of:

> I direct that all estate, inheritance, transfer, legacy or succession taxes, or death duties (including interest and penalties thereon) which may be assessed or imposed with respect to my estate, or any part thereof, of whatever nature and description and wheresoever situated, . . . shall be paid out of the principal of my residuary estate; *and such payment shall be made as an expense of the administration of my estate without apportionment.*

Id. at 647, 919 A.2d at 644 (emphasis and ellipsis in original) (internal quotation marks omitted).

The testator's daughter originally abided by the terms of the will and deducted the inheritance tax from the entire amount of the residuary estate; however, before distribution of the residuary estate, she amended the administration account such that the entirety of the inheritance tax burden for the residuary estate came out of the fourth legatee's portion of the residuary estate. See id. at 647, 919 A.2d at 644. The fourth legatee challenged the amendment, but the Orphans' Court for Montgomery County upheld the amendment, finding that the legislative intent of TG § 7-203(b) controlled over the "boilerplate language" of the will. Id. at 647-48, 919 A.2d at 644. Upon determining that the clearly expressed intent of the testator was that the inheritance tax be paid from the residuary estate without apportionment, we reversed the judgment of the Orphans' Court for Montgomery

---

(i) a grandparent of the decedent;
(ii) a parent of the decedent;
(iii) a spouse of the decedent;
(iv) a child of the decedent or a lineal descendant of a child of the decedent;
(v) a spouse of a child of the decedent or a spouse of a lineal descendant of a child of the decedent;
(vi) a brother or sister of the decedent; or
(viii) a corporation if all of its stockholders consist of individuals specified in items (i) through (vi) of this paragraph.

County.  See id. at 660, 919 A.2d at 652.  In so holding, we emphasized the primacy of the testator's intent in determining the allocation of an estate, and noted that it must control unless in conflict with law or public policy, stating:

> [T]he testator must have intended that the amount of the residuary shares to be distributed would be determined based on the value of the residuary estate after the taxes had been paid, off the top, out of the estate; it was the clear intention of the testator that each individual share of the residuary estate be determined after the taxes were paid on the entire estate, albeit from the residuary estate.  Thus, it is immaterial that under the Tax Code, some of the legatees would not have been obligated, in any event, to pay taxes on their share; they are, in reality, not being taxed on their residuary share, nor is any residuary legacy being reduced.  As we have said, the intent of the testator, as ascertained from the language of the will, controls the source of the funds to be used to pay inheritance taxes so long as there is no conflict with the applicable statute, other law or public policy.

Id. at 655, 919 A.2d at 649 (citation omitted).

To ascertain the intent of the testator, the Court considers a will in its entirety.  See Wesley Home, Inc. v. Mercantile-Safe Deposit & Trust Co., 265 Md. 185, 198, 289 A.2d 337, 344 (1972) ("It is, of course, the cardinal principle of construction of wills that the intention of the testator be carried out, as deduced from the 'four corners' of the will." (Citations omitted)); Marty v. First Nat'l Bank of Balt., 209 Md. 210, 217, 120 A.2d 841, 844 (1956) ("Th[e] expressed intention of a testator must be gathered from the language of the entire will, particularly from the clause in dispute, read in the light of the surrounding circumstances at the time the will was made."  (Citations omitted)).  In determining the testator's intent, we give the words in the will their plain meaning and seek "to harmonize its provisions and avoid conflicts, such that the interpretation gives effect to each provision wherever possible."  Bandy, 449 Md. at 613, 144 A.3d at 824 (citation omitted).  "Where

- 19 -

. . . the intention is evident from the context of the will, but is made obscure by an inaccurate or inapt expression, the Court may insert, delete, correct, or transpose words and phrases in order to remove the ambiguity[,] and thereby effectuate the testator's intention." Hebden, 196 Md. at 51, 75 A.2d at 129 (citations omitted).

In LeRoy v. Kirk, 262 Md. 276, 279-80, 277 A.2d 611, 613 (1971), we held that, when considered in the context of an entire will, the phrase "personal property" pertained only to tangible personal property. In LeRoy, id. at 278, 277 A.2d at 612, the testators, a husband and wife, executed nearly identical wills, which included instructions on devising their property once both spouses died. The will provided, among other things, that a friend receive "the sum of Ten Thousand Dollars ($10,000) and all of [the testators'] personal property, including [their] automobile, boat and the contents of [their] house and outbuilding[.]" Id. at 278, 277 A.2d at 612 (internal quotation mark omitted). The will further provided that the

> Executor [was] to liquidate that portion of [the] estate remaining after payment of the bequests set forth in ITEMS IV, V, and VI above, and to distribute the resulting sum in equal shares to the ANNE ARUNDEL GENERAL HOSPITAL, Annapolis, Maryland, and the ANNE ARUNDEL COUNTY CHAPTER OF THE SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS[.]

Id. at 278-79, 277 A.2d at 612.

After both spouses died, a dispute arose between the friend and the Anne Arundel General Hospital and the Society for the Prevention of Cruelty to Animals as to the meaning of the phrase "personal property" as used in the will. See id. at 279, 277 A.2d at 612. The friend contended that "personal property" included both tangible and intangible

personal property, whereas the Anne Arundel General Hospital and the Society for the

Prevention of Cruelty to Animals argued that the phrase referred only to tangible personal

property.  See id. at 279, 277 A.2d at 612.  The friend maintained that the language of the

will unambiguously demonstrated the testators' intent to provide the friend with all of their

personal property, including intangible personal property, such as stocks and cash.  See id.

at 280-81, 277 A.2d at 613.  We disagreed, explaining:

> We find the [friend's] approach to be too simplistic.  It is true that a
> bequest of 'personal property' without more includes every form of personal
> property, tangible and intangible, from whatever source derived, that is
> everything except real estate.  It is equally true, however, that the broad scope
> of the words 'personal property' standing alone is limited by the rule that 'if
> there be anything in any part of the will which restricts or qualifies the
> general term, the latter must be so restricted and qualified, if it can be done
> without violating some other principle of law or the manifest intention of the
> testator.'

Id. at 281, 277 A.2d at 613 (citation omitted).

In determining the intended meaning of the phrase "personal property[,]" we

emphasized the importance of considering the words of a clause in the context of the

testators' intent as demonstrated throughout the entirety of the will:

> The search is not for [the testator's] presumed but for his [or her] expressed
> intention.  What must be sought is the true meaning of his [or her] words, not
> what he [or she] meant as distinguished from what [the] words express, 'but
> simply what is the true meaning of [the] words; not merely what he [or she]
> meant, but what [the] words mean.'  What the words express is to be
> interpreted according to their plain meaning and import. This expressed
> intention must be gathered from the language of the entire will, particularly
> from the clause in dispute, read in the light of the surrounding circumstances
> when the will was made.

Id. at 279-80, 277 A.2d at 613 (citation omitted).  In LeRoy, id. at 283, 277 A.2d at 614,

we observed that the testators had identified their personal property to be tangible personal

property—*i.e.*, a boat, car, and contents of their house—whereas, in other sections of the will, the testators placed no such limitations on bequests. We also noted that the structure of the bequests became unworkable if we were to interpret the will as granting the friend all of the testators' tangible and intangible personal property:

> Debts, expenses and death taxes are directed to be paid from the residue. If it was intended that [the friend] was to get all the intangible personal property as well as all the tangibles, the residue could have consisted only of the real estate, that is, the home property. To pay the death taxes there would have had to have been one sale of the realty early in the administration of the estate and there could have been no other later sale of 'that portion of [the] estate remaining after payment of the bequests * * *.' One can only conclude that the testator foresaw that there would be a liquidation of estate assets after [the friend]'s bequests had been distributed to her.

Id. at 283-84, 277 A.2d at 615 (ellipsis in original). Thus, we concluded that the phrase "personal property," when considered in the context of the entire will, pertained solely to tangible personal property. See id. at 279, 277 A.2d at 613.

Similarly, in Childs v. Hutson, 313 Md. 243, 247, 545 A.2d 43, 45 (1988), we held that a broadly-phrased devise of a life tenancy in a will did not grant the life tenant the right to subsequently gift the property to another party. In that case, the testatrix executed a will in which she granted a life tenancy in the family home to her daughter, who was one of the testator's three adult children. See id. at 244, 545 A.2d at 44. Specifically, the will granted the daughter the "'full power to sell, mortgage, lease, rent or in any other manner whatsoever to dispose of the entire estate, or any portion thereof (except by Will).'" Id. at 244, 545 A.2d at 44. The will provided that, in the event that the daughter sold the property, the net proceeds of the sale would be divided among the three adult children, with $1,000 provided to the testatrix's son, two-thirds to the daughter with the life tenancy, and one-

third to the testatrix's other daughter. See id. at 244-45, 545 A.2d at 44. The will ordered that, if the daughter with the life tenancy passed away before selling the property, the estate's executor was to sell the property and divide the proceeds according to the same ratio, but with the testatrix's granddaughter standing in the place of her mother and receiving two-thirds. See id. at 245, 545 A.2d at 44.

The daughter retained the property for eighteen years. See id. at 244-45, 545 A.2d at 44. Shortly before her death, she deeded the property to her daughter, the testatrix's granddaughter, without consideration. See id. at 245, 545 A.2d at 44. The testatrix's other daughter and the heirs of the testatrix's son initiated an action seeking to invalidate the deed. See id. at 245, 545 A.2d at 44. Specifically, they contended that the will, when considered as a whole, did not grant the daughter the power to gift the property. See id. at 245, 545 A.2d at 44. Conversely, the granddaughter argued that the testatrix's will granted the daughter the authority to dispose of the property in any manner that she chose. See id. at 246, 545 A.2d at 45. We explained the granddaughter's argument as follows:

> [The granddaughter] claim[s] that the plain meaning of the words contained in [the testatrix]'s will manifested an intention to grant [her daughter] absolute powers of disposition of the [] property, including disposition by gift. [The granddaughter] argue[s] that [the testatrix]'s intention must be gathered from only one source[—]the words employed by her. Accordingly, the [granddaughter] say[s] that because [the testatrix] vested [her daughter] with unlimited power to dispose of the [] property "in any other manner whatsoever," except by will, that intention can only be gratified if [the daughter]'s gift of the property is upheld.

Id. at 246, 545 A.2d at 45.

We concluded, however, that the granddaughter's interpretation of the will was at odds with the testatrix's general intent, and that the provision of the will granting the

daughter the right to dispose of the property could not be read in isolation. See id. at 247, 545 A.2d at 45-46. Rather, we determined that the provision at issue needed to be considered in the context of the entire will, stating:

> Of course . . . the intention of the testatrix is to be determined by the words employed by her. But those words are not to be considered in isolation, but only in association with the other provisions of the will[—]the overall testamentary plan of the testatrix. In other words, the will must be read as a whole. Therefore, [the daughter]'s power to sell, mortgage, lease, rent, or "in any other manner whatsoever to dispose of the entire estate," except by will, must be construed in light of, and circumscribed by, [the testatrix]'s intent that the property would provide a residence or support for [the daughter] but would eventually be sold and the proceeds distributed to the designated beneficiaries. **Thus, while the words contained in the broad power of disposition given [the daughter] in this case, if literally applied, would accommodate a gift of the property, the will in its entirety reveals that such a disposition was not within [the testatrix]'s real intention**. The general plan of [the testatrix]'s will required that whatever disposition [the daughter] made of the property under the power granted to her, a monetary value would be received for it.

Id. at 247, 545 A.2d at 45-46 (emphasis added). In reviewing the will in its entirety, we also found it significant that the testatrix had given other property to her daughter outright, without any restrictions, yet had expressly chosen not to do so with the family home. See id. at 248, 545 A.2d at 46 ("Indeed, had [the testatrix] intended that [her daughter] have an unrestricted power of disposition over the property, she would have given it to her outright, as she did with her other property."). In sum, we concluded that the authority granted to the daughter with respect to the family home did not include the power to gift the property. See id. at 247-48, 545 A.2d at 46.

**Analysis**

In this case, taking into account the language of the entire irrevocable trust, we hold that the plain language of Item Tenth does not grant authority for three beneficiaries of the trust to remove the fourth beneficiary, and that the irrevocable trust clearly demonstrates Vito's intent for the trust to benefit his four children—the four beneficiaries—equally. In other words, Amendment V—in which three of the four beneficiaries purported to divest the fourth beneficiary, Candace—was impermissible under the terms of the irrevocable trust. Item Tenth does not provide 75% of the beneficiaries with the power to divest the remaining beneficiary. Although Item Tenth gives 75% of the beneficiaries authority to revoke, alter, or amend the terms of the irrevocable trust, an interpretation that grants three beneficiaries the power to divest the fourth beneficiary would directly contravene Vito's express intent, as ascertained from the language of the irrevocable trust, which was that the irrevocable trust benefit his four children equally.

Guided by the principles of testamentary interpretation set forth in Pfeufer, 397 Md. at 660, 919 A.2d at 652, LeRoy, 262 Md. at 281, 277 A.2d at 614, and Childs, 313 Md. at 247, 545 A.2d at 45, we conclude that the trust agreement is to be construed based on the settlor's intent, as ascertained from the language of the provision at issue, within the context of the document as a whole. In this case, Vito's intent to have the irrevocable trust benefit his four children equally is evident from the totality of the irrevocable trust's language. Similar to this Court's determination in Childs, 313 Md. at 247, 545 A.2d at 45, if read in isolation, the language of item Tenth could arguably be interpreted to permit divestment of a beneficiary by 75% action of the beneficiaries. But, when the content of

Item Tenth is considered along with the language of the irrevocable trust in its entirety, it is clear that Item Tenth does not grant authority for 75% of the beneficiaries to divest a remaining beneficiary, and Amendment V cannot be reconciled with Vito's clear intent.

Even a cursory review of Item Tenth reveals that Item Tenth does not provide 75% of the beneficiaries with the power to change the number of beneficiaries and eliminate a remaining beneficiary of the irrevocable trust. Indeed, Item Tenth makes no express mention of increasing or decreasing the number of beneficiaries, and speaks only of generally amending, altering, or revoking the terms of the irrevocable trust. Plainly, the language of Item Tenth does not explicitly resolve the present issue.

When read in its entirety, the plain language of the irrevocable trust provides ample substantiation that Vito intended the irrevocable trust to benefit all four children. Significantly, the preamble includes the following language:

> WHEREAS, [Vito] desires to dispose of said contract by gift on this date to this Trust **for the immediate benefit of his children, namely, CANDACE VITO GRUEFF, JUDITH A. VITO, MICHAEL A. VITO, and JOHN T. VITO** (hereinafter referred to as the "Beneficial Owners" or "Beneficiaries") of the fee interest in said property in which he will be the owner of all buildings and improvements thereon[.]

> * * *

> NOW, THEREFORE, to accomplish such purposes [Vito] does hereby give all his right, title and interest in and to the fee interest in said property to PAUL M. VITO, as Trustee, **in equal shares, for his children, CANDACE VITO GRUEFF, JUDITH A. VITO, MICHAEL A. VITO, and JOHN T. VITO**, and [Vito] does hereby establish a Trust Fund subject to the terms and conditions hereof under which the Trustee agrees to hold said fund, **all as herein provided for the benefit of and in behalf of [Vito]'s said children**[.]

(Emphasis added). Within the irrevocable trust, Vito included provisions to ensure that his four children would receive the benefits of the trust:

> [T]he Trustee shall at least once each year distribute all the net income and any capital gains of the trust to the beneficial owners in the shares set forth in item SIXTH below in such partial or periodic distributions as he deems appropriate within his discretion.

* * *

> Upon the termination of this Trust . . . the Trust Estate then held by the Trustee shall be paid over, transferred and delivered to the beneficiaries in the shares set forth in Item SIXTH below, free of all Trusts.

* * *

> SIXTH: If at any time the assets comprising the Trust estate shall have been liquidated and all of the aforesaid assumed obligations or liens or encumbrances on the Trust property have been satisfied, the Trustee shall, after setting aside an amount which in his judgment will be sufficient to provide for the payment of any taxes and/or costs of administration, pay over and distribute the remaining assets, exclusive of the reserve for taxes and/or costs, to the beneficiaries free of all Trust, in the shares listed below:

| | |
|---|---|
| CANDACE VITO GRUEFF | 25% |
| JUDITH A. VITO | 25% |
| MICHAEL A. VITO | 25% |
| JOHN T. VITO | 25% |
| | 100% |

* * *

> EIGHTH: In the event of the death of any of the issue of [Vito], prior to the termination of this Trust, the beneficial interest herein of such deceased person shall pass to his or her estate.

Tellingly, in addition to Item Sixth, which identifies Vito's four children by name and directs that each receive an equal 25% share of the trust, Item Eighth specifies that, in

- 27 -

the event that one of the beneficiaries dies while the trust is in existence, the deceased beneficiary's estate, **not** the other beneficiaries, would be entitled to the deceased beneficiary's share. In other words, under Item Eighth, Candace's heirs would inherit her interest in the trust. Thus, Michael's and Judith's interpretation of Item Tenth is at odds with the intent evident in Item Eighth, as well as the preamble.

As we explained in Childs, 313 Md. at 247, 545 A.2d at 45, when interpreting a will, the intention of the testator is ascertained by the language employed by the testator in the context of the will as a whole. As we noted in Childs, id. at 247, 545 A.2d at 45, had we analyzed the clause at issue in isolation, we would have concluded that the testatrix's daughter was empowered to dispose of the property in any way that she saw fit, except by will. In Childs, id. at 247, 545 A.2d at 45, however, we explained that the testatrix's "words are not to be considered in isolation, but only in association with the other provisions of the will[—]the overall testamentary plan of the testatrix." Our considerations in this case are the same. Without further context, Item Tenth could debatably be read to permit divestment of a beneficiary through amendment of the irrevocable trust. When Item Tenth is considered in the context of the entirety of the irrevocable trust, however, it is clear that it was not Vito's intent that three beneficiaries could divest the remaining beneficiary.

In more than one instance, Vito provided that the irrevocable trust was intended to benefit his four children equally, including Candace. As such, adopting Michael's and Judith's interpretation would lead to an unreasonable result. As Candace points out, Michael's and Judith's interpretation of the irrevocable trust would, in theory, have permitted Michael, Judith, and Timothy to remove Candace instantly as a beneficiary of

- 28 -

the irrevocable trust as soon as the trust was created. This outcome cannot be reconciled with Vito's intent, and would have brought about the result of immediately undermining the purpose of the irrevocable trust.

Beyond the language of Item Tenth authorizing the alteration, revocation, or amendment of the irrevocable trust, we discern no language in the irrevocable trust that would even remotely suggest that Vito intended to permit 75% of the beneficiaries to divest the remaining beneficiary. Notably, Amendment V, by having amended only Item Sixth of the irrevocable trust, and not having amended the preamble and other provisions of the irrevocable trust, creates an instrument that is internally inconsistent. The preamble explicitly provides that the named beneficiaries, including Candace, are to share equally in the benefits of the irrevocable trust. At oral argument, Michael's and Judith's counsel acknowledged that Amendment V changed only the terms of Item Sixth and had no effect on the preamble. Thus, were we to assume that Vito intended to permit 75% of the beneficiaries to amend the irrevocable trust divest another beneficiary—which we do not— without altering the preamble, the amendment to Item Sixth would directly contradict the preamble and other portions of the irrevocable trust, such as Item Eighth. In short, Amendment V, in amending only Item Sixth, did not effectively alter the irrevocable trust to divest Candace, as the preamble still provides that Candace, like the other three beneficiaries, is to share equally in the benefits of the trust, and Item Eighth continues to provide that, in the event of the death of any of Vito's children before the trust terminates, the beneficial interest will pass to that child's estate.

Similarly, we observe that Amendment V also produces the unacceptable result of

rendering the 75% amendment provision of Item Tenth illogical. Item Tenth does not require unanimity for alterations, amendments, or revocations of the terms of the irrevocable trust, but rather provides that such changes would require approval of at least 75% of the beneficiaries. By reducing the number of beneficiaries to three, Amendment V made it impossible to amend the irrevocable trust without unanimity because, without Candace as a beneficiary, only three beneficiaries remain, and it is mathematically impossible to have an exact 75% majority of three people. Indeed, Michael's and Judith's counsel conceded as much at oral argument. At oral argument, upon a question from the Court, Michael's and Judith's counsel acknowledged that Item Tenth now requires unanimity of the beneficiaries to amend the irrevocable trust. As with the failure to amend the preamble, Amendment V pertained only to Item Sixth, not Item Tenth, and, as a result, now renders Item Tenth's 75% amendment provision unworkable.

Indisputably, this case's circumstances are similar to those of Childs, 313 Md. 243, 545 A.2d 43. As in Childs, id. at 245-46, 545 A.2d at 44-45, at issue is the extent of the authority that a maker of an instrument intended to give a beneficiary. In Childs, id. at 244-47, 247, 545 A.2d at 44-45, the parties, who were siblings and beneficiaries to a will, disagreed as to whether a beneficiary had the authority to gift the family home where sale of the home was intended to benefit all of the sibling beneficiaries. In this case, the parties disagree as to the scope of the beneficiaries' authority to modify the irrevocable trust. Namely, Item Tenth does not expressly set forth whether it provides three of the beneficiaries with the authority to divest a fourth beneficiary. As explained above, we must consider the language of the irrevocable trust in its entirety to ascertain Vito's intent. We

- 30 -

conclude that Vito's clear intent to benefit his four children equally cannot be reconciled with an interpretation of the irrevocable trust that would permit three of the beneficiaries to divest the fourth beneficiary.

At oral argument, Michael's and Judith's counsel discussed the "objective rule of contract[.]" Maryland case law prescribes an objective interpretation of contracts, while case law pertaining to the interpretation of wills—and, by extension, trust agreements— directs that the goal is to effectuate the settlor's intent, as gleaned from the entire trust agreement. As evident from the relevant case law, the interpretation of a will is guided first and foremost by the testator's intent. This approach, which applies equally to interpretation of trust agreements, differs notably from case law governing the interpretation of contracts. Indeed, when interpreting a contract, we have adopted an objective approach in which the court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." Spacesaver Sys., Inc. v. Adam, 440 Md. 1, 8, 98 A.3d 264, 268 (2014) (citation omitted). Thus, we have explained that, when interpreting the terms of a contract, the subjective intent of the parties is not controlling:

> In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. **Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean**.

Id. at 8, 98 A.3d at 268-69 (emphasis added) (citation omitted). Maryland case law regarding the interpretation of contracts differs from case law pertaining to the

interpretation of wills and trusts, where ascertaining the testator's or settlor's "[i]ntention is primary and paramount." Marty, 209 Md. at 216, 120 A.2d at 844.

We are not persuaded by Michael's and Judith's contention that the irrevocable trust's reference to both the lowercase term "beneficiaries" and the capitalized term "Beneficiaries" allegedly differentiates between the defined group of four "Beneficiaries" and an undefined group of potential other "beneficiaries," and evinces an unspoken presumption by Vito that the designated beneficiaries might change over time. Although the preamble defines "Beneficiaries" as Vito's four children, throughout the trust instrument the four children are also referred to as "beneficiaries[.]" As Candace correctly points out, the capitalized term "Beneficiaries" is not used in the irrevocable trust with the exception of one reference in the preamble. The subsequent use of "beneficiaries" appears to be nothing more than a typographical oversight or the use of the lowercase version of the word to which Vito attached no significance, rather than an intentional distinction between people who could benefit from the trust. Indeed, it would be nonsensical for Vito to define "Beneficiaries" once in the document and then never use the word again.

On brief, Michael and Judith mischaracterize the Court of Special Appeals's analysis by arguing, in a single sentence without elaboration or discussion, that it incorrectly applied the principle of *expressio unius est exclusio alterius*, which is "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." *Expressio unius est exclusio alterius*, Black's Law Dictionary (10th ed. 2014); see also Breslin v. Powell, 421 Md. 266, 287-88, 26 A.3d 878, 891 (2011) ("[C]ourts may consider with caution the can[]on of [statutory] construction,

- 32 -

*expressio unius est exclusio alterius*, meaning to express or include one thing implies the exclusion of the other, or of the alternative[.]" (Citation and internal quotation marks omitted)). We do not discern that the Court of Special Appeals based its decision—"that a broadly worded power to amend in an irrevocable trust instrument cannot be used by a majority of beneficiaries to divest a minority beneficiary of her interest in the trust when doing so would be contrary to the settlor's intent in creating the trust"—solely on Item Tenth's lack of a reference to removing a beneficiary. Grueff, 229 Md. App. at 356, 145 A.3d at 87. Rather, the Court of Special Appeals specifically noted that the language of Item Tenth had to be considered in the context of the entire trust instrument:

> Item TENTH of the Irrevocable Trust is a generally worded power. It allows the "Agreement" to "be revoked, altered or amended from time to time by an instrument in writing, signed by the holders of not less than seventy-five (75%) interest" in the trust, and delivered to the Trustee. Read broadly, the "alter and amend" language in Item TENTH would seem to give the holders of a 75% beneficial interest in the trust the power to make *any* change to the trust instrument, including, as Michael and Judith argue, to eliminate the beneficial interest of the 25% beneficiary and allocate it among the remaining beneficiaries. Item TENTH does not specify that that can be done, however, and therefore we must look to the entire trust instrument to determine whether such a reading of Item TENTH is consistent with [Vito]'s intention as the Settlor of the trust.

Id. at 371, 145 A.3d at 96-97 (emphasis in original). The Court of Special Appeals properly considered the entire trust instrument to ascertain Vito's intent. We detect no misapplication of the principle of *expressio unius est exclusio alterius* in the Court of Special Appeals's analysis.

Michael and Judith also contend that the Court of Special Appeals "implicitly appl[ied]" the Maryland Trust Act in reaching its decision. We observe, however, that the

- 33 -

Court of Special Appeals mentioned the Maryland Trust Act once in the body of its opinion in reference to a potential future claim brought by Candace regarding the revocable trust:

> In this opinion, we have reviewed the rulings that were made in the circumstances that they were made; specifically, with respect to the Revocable Trust, that [Vito] was alive. [Vito]'s death rendered the Revocable Trust irrevocable. Whether, post [Vito]'s death, Candace is in a position to bring claims against Mary and Brennan for alleged breaches of the duties they owed [Vito] as the Settlor is a question not before us. We note that any such claim would be governed by the Maryland Trust Act.

Grueff, 229 Md. App. at 383, 145 A.3d at 103-04 (citations and footnote omitted). Earlier in the opinion, in a footnote, the Court of Special Appeals explicitly stated that the Maryland Trust Act did not apply to this case:

> We read [the language regarding the effective date of the Maryland Trust Act] to mean that the Act was not controlling when the circuit court made its ruling concerning the trusts in this case. Clearly, if the Act had controlled when the Irrevocable Trust was amended to eliminate Candace's beneficial interest, the amendment would not have survived.

Id. at 368 n.7, 145 A.3d at 94 n.7. Plainly, the Court of Special Appeals did not base its decision on the Maryland Trust Act.

In addition to contending that Amendment V contravened Vito's clearly stated intention, in her brief and at oral argument, Candace contended that Amendment V violated well-established Maryland law regarding the testamentary power of appointment. We agree. As to distribution and disposal of testamentary property, Maryland's case law concerning power of appointment constrains a beneficiary's power to appoint to himself or herself the property of a testamentary estate:

> The Maryland law on powers of testamentary appointment is unusual if not unique. A power to appoint or dispose of property by will, unrestricted as to beneficiaries, as for example, 'in such manner as she may see fit' (*Balls*

*v. Dampman*, 69 Md. 390, 391, 16 A. 16, 17) or 'to such person or persons as she may limit, nominate, and appoint' (*Lamkin v. Safe Deposit & Trust Co.*, 192 Md. 472, 475, 64 A.2d 704, 705), is called in Maryland a general power, as it is in most jurisdictions, but unlike most jurisdictions, Maryland holds that such a power does not authorize the holder of the power to appoint to him[- or her]self, to his [or her] own estate or to his [or her] creditors unless the power in terms so authorizes (with the exception that where the donee and donor of the power are the same person, an appointment may be made to a creditor, *Wyeth v. Safe Deposit and Trust Co.*, 176 Md. 369, 4 A.2d 753).

Frank v. Frank, 253 Md. 413, 415, 253 A.2d 377, 379 (1969). Thus, in Maryland, beneficiaries may appoint testamentary property to themselves or for their benefit only where the instrument specifically grants the beneficiaries this authority. See Bryan v. United States, 286 Md. 176, 179, 406 A.2d 423, 425 (1979) ("Since 1888, we have consistently adhered to the view that the donee of a testamentary power otherwise general may not direct property subject to the power to his [or her] own use, absent a specific enabling grant of this authority." (Citation omitted)). Under Maryland's common law, any amendment granting a majority of beneficiaries the power to apportion to themselves a larger share of a trust than that to which they were originally entitled would have to be explicitly stated in the original trust instrument. In this case, the irrevocable trust did not contain such a provision; yet, with Amendment V Michael, Judith, and Timothy increased each of their own shares of the benefits of the trust from 25% to 33 1/3%. Thus, by executing Amendment V, Michael, Judith, and Timothy impermissibly granted to themselves a greater apportionment of the trust property than Vito intended. As they lacked

the explicit appointment power to do so, this action was prohibited under Maryland case law.[8]

In sum, we hold that Item Tenth of the irrevocable trust does not authorize 75% of the beneficiaries to remove the remaining beneficiary. Our holding is grounded in the well-established principle that the settlor's intent controls the disposition of the trust property. In this case, Vito's intent that the irrevocable trust benefit his four children equally is

---

[8]Although not raised by the parties, we note that the execution of Amendment V during the pendency of the instant litigation also raises the specter of the doctrine of unclean hands. The doctrine of unclean hands is an equitable doctrine, which we have explained as follows:

> The unclean hands doctrine states that courts of equity will not lend their aid to anyone seeking their active interposition, who has been guilty of fraudulent, illegal, or inequitable conduct in the matter with relation to which he [or she] seeks assistance. The doctrine does not mandate that those seeking equitable relief must have exhibited unblemished conduct in every transaction to which they have ever been a party, but rather that the particular matter for which a litigant seeks equitable relief must not be marred by any fraudulent, illegal, or inequitable conduct.

Dickerson v. Longoria, 414 Md. 419, 455, 995 A.2d 721, 743 (2010) (citation, brackets, and internal quotation marks omitted). We have noted that the doctrine of unclean hands applies only when the inequitable conduct and the transaction at issue intersect. See Adams v. Manown, 328 Md. 463, 475, 615 A.2d 611, 617 (1992) ("Thus, an important element of the [un]clean hands doctrine is that the alleged misconduct must be connected with the transaction upon which the claimant seeks relief.").

Here, Michael, Judith, and Timothy executed Amendment V after Candace had filed a complaint seeking, among other things, Michael's and Judith's removal as trustees of the irrevocable trust and a full accounting of their dealings with the irrevocable trust. Plainly, Michael and Judith sought to divest Candace as a means of eliminating her standing in the underlying matter so that Candace would not be able to pursue the claims made in her complaint. Indeed, the circuit court granted their motion to dismiss and/or for summary judgment against Candace on this basis. These circumstances call into question Michael's and Judith's motivation with respect to the amendment of the irrevocable trust.

clearly demonstrated in the trust instrument and, as such, the divestment of Candace by

Michael, Judith, and Timothy was plainly inconsistent with Vito's intent.[9]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONERS TO PAY COSTS.**

---

[9]In her brief, Candace also contends that Michael and Judith violated their fiduciary duty as trustees of the irrevocable trust by divesting her. Under Maryland Rule 8-131(b)(1), this Court "ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals." This issue was not squarely addressed by the circuit court, nor raised by Candace in a cross-petition for a writ of *certiorari*. Thus, the issue is not properly preserved for our review. Furthermore, as we hold in favor of Candace, we perceive no need to address the matter.