*In the Matter of the Albert G. Aaron Living Trust*, No. 21, September Term, 2017

**TRUSTS — TRUST CONSTRUCTION —** The circuit court correctly found that the settlor, when he planned for a charitable distribution that would lapse "[i]f my wife survives me," intended to refer to his first wife rather than his second wife. The settlor expressly defined "my wife" as his first wife in the Trust Agreement and never amended it; specifically used the second wife's name when he intended to refer to her; and made amendments to the planned charitable foundation that, in light of his poor health, he would likely not have made if he expected the distribution to lapse. The settlor's first wife did not survive him; therefore, the distribution to the foundation did not lapse.

Circuit Court for Baltimore City
Case No. 24-C-15-003610
Argued: November 2, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 21

September Term, 2017

_____

IN THE MATTER OF THE ALBERT G.
AARON LIVING TRUST

_____

Barbera, C.J.,
Greene
Adkins
McDonald
Hotten
Getty
Rodowsky, Lawrence F.
(Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Barbera, C.J.

_____

Filed: March 26, 2018

This appeal reaches us from a dispute between Petitioners, certain interested parties and beneficiaries of a trust created by Albert G. Aaron, and Respondents, the Trustees appointed to execute and oversee the trust. One term of the trust agreement provided that a charitable foundation would be created unless Mr. Aaron was survived by his wife, in which case the foundation would not come into existence. Mr. Aaron's first wife predeceased him, but Mr. Aaron remarried. The parties dispute to which wife the provision should apply. Resolution of that dispute determines whether the charitable foundation survives.

## I.

### Facts and Procedural History

*The Trust*

During his life, Albert G. Aaron ("Mr. Aaron") transferred most of his assets to a revocable trust, the Albert G. Aaron Living Trust (the "Trust" or, when appropriate, the "Trust Agreement"). He created the Trust on August 27, 2008, restated it in full on August 10, 2009, and amended it eleven times between 2009 and 2013. Mr. Aaron was married to Eileen Aaron ("Eileen") for many years, but they were separated for the last several. Eileen died on November 1, 2012. On or about November 6, 2012, Mr. Aaron married Myrna Kaplan ("Myrna"), his long-time girlfriend.

On January 10, 2013, Mr. Aaron executed the Eleventh Amendment to the Trust. It was the only amendment made after Eileen's death and Mr. Aaron's marriage to Myrna. At the time of that amendment, Mr. Aaron was battling esophageal cancer. On January 26,

2013, sixteen days after making the Eleventh Amendment, Mr. Aaron died at the age of 85. Myrna survived Mr. Aaron.

Mr. Aaron and Eileen had one child together, Jonathan P. Aaron ("Jonathan"). Jonathan is married to Cheryl Aaron ("Cheryl"). Jonathan and Cheryl have two daughters, Theda R. Aaron ("Theda") and Lena S. Aaron ("Lena"). Myrna, Jonathan, Cheryl, Theda, Lena, and Frances A. Rossi ("Frances," Mr. Aaron's long-time assistant) are beneficiaries of the Trust. All beneficiaries, aside from Myrna and several charitable organizations who are not parties to this appeal, are Petitioners here (hereinafter, collectively, the "Beneficiaries"). Upon Mr. Aaron's death, Respondents, Steven G. Albert and Howard E. Goldman, became the Trustees and Trust Advisors of the Trust.

The various Articles of the Trust Agreement lay out the terms of the Trust. Article Two, "Family Information," was never amended. It provided the following:

> I am married to Eileen Aaron. Any reference in this agreement to "my wife" is a reference to Eileen Aaron.
>
> * * *
>
> I have also provided for the following individuals in this agreement:

> | Name | Relationship |
> |------|-------------|
> | Myrna Kaplan | Friend[.] |

Articles Six through Twelve provide for specific distributions of property and create several trusts: the "Marital Deduction Trust," the "Exempt Marital Deduction Trust," the "Non-Exempt Marital Deduction Trust," the "Myrna Kaplan Trust," the "Frances A. Rossi Trust," and the "Grandchildren's Trusts." Article Thirteen of the Trust Agreement, Section 13.01, provides for the creation of a Consolidated Residuary Trust. The Consolidated

2

Residuary Trust was created to hold the residuary of the trust property, so long as either Myrna or Frances was living. The beneficiaries of the Consolidated Residuary Trust are Myrna, Frances, Jonathan, Cheryl, and Jonathan's descendants (Theda and Lena). The Trustees were authorized to make distributions to those beneficiaries and to use it as a source of payment for obligations created under other Articles of the Trust Agreement. Section 13.02 directed that, on the death of both Myrna and Frances, the Consolidated Residuary Trust be terminated and its assets distributed in accordance with the subsequent sections of Article Thirteen. Once the Consolidated Residuary Trust was terminated, Section 13.03 directed the Trustees to designate 25% of the remaining trust property as the "Foundation Share" and the balance of 75% as the "Family Share."

Section 13.04 directed the Trustees to use the Foundation Share to create the Aaron Family Foundation ("Foundation"), a private organization within the meaning of § 509(a) of the Internal Revenue Code and treated as tax-exempt under § 501(c)(3) of that Code. Section 13.04 contained the following contingent clause at issue:

> *If my wife survives me, this distribution shall lapse* and the property subject to this distribution shall instead be distributed under the other provisions of this agreement.

(Emphasis added). Consequently, if Mr. Aaron outlived his wife, the Foundation would be created. But if his wife survived him, the distribution to the Foundation would lapse and Mr. Aaron's other beneficiaries—i.e., Jonathan, Cheryl, Theda, and Lena—would receive the remaining 25% of the Consolidated Residuary Trust. The next five pages of Section 13.04 stated the purpose of the Foundation, established an Advisory Committee to

3

control its charitable activities, and detailed specific recurring distributions that the Foundation was to make, among other things.

Mr. Aaron amended the Trust Agreement eleven times before his death. The majority of the changes in the first ten amendments concerned distributions to Myrna and Frances. Those amendments did not reference Section 13.04 and are largely irrelevant to the issue we decide.

The Eleventh Amendment, however, made several significant changes to the Trust Agreement. It amended Section 6.01, which addressed the distribution of Mr. Aaron's automobiles, to add that "[t]he Jaguar is conveyed to Myrna Kaplan Aaron, my current wife." It also altered Section 6.04, which concerned the creation of a Marital Deduction Trust. The Amendment provided that "Section 6.04 originally intended to be relevant for provisions of my past deceased wife, Eileen Aaron, shall now be intended to be for my current wife, Myrna Kaplan Aaron." In addition, the amendment increased from $2 million to $8 million the amount to be allocated to the Marital Deduction Trust and provided that the Marital Deduction Trust should be used first to satisfy all distributions to Myrna. The Eleventh Amendment also "specifically revoke[d] the provisions of the First Amendment which provided that Sections 7.01, 7.02, 7.03, and 7.04 of Article Seven were to be deleted if my spouse survived me" and mandated that "such sections shall apply to Myrna Kaplan Aaron."

Mr. Aaron made two other changes in the Eleventh Amendment that are worth noting. Mr. Aaron changed the composition of the Advisory Committee. Originally, the members were to be Jonathan, Myrna, Richard G. Wohltman ("Richard"), and Steven G.

4

Albert. Paragraph E of the Eleventh Amendment removed Myrna and Richard from the Committee and provided that "[t]he remaining initial members shall select two other members so that there will be four members in total."[1] Mr. Aaron also amended Section 6.06, which concerned his real property interests, to provide in part that "[i]f Myrna Kaplan Aaron should predecease me, this distribution shall lapse[.]" Mr. Aaron referred either to "Myrna Kaplan Aaron" or "Myrna Kaplan" each time she was mentioned in the Eleventh Amendment.

The Trust Advisors were authorized under Section 3.10(j) of the Trust Agreement to amend any provision of the agreement to "[c]orrect ambiguities, including scrivener errors, that might otherwise require court construction or reformation[.]" The Trust Advisors were not permitted to "limit or alter the rights of a beneficiary in any trust assets held by the trust before the amendment."

*The Court Proceedings*

Shortly after Mr. Aaron's death, Myrna requested certain payments from the Trustees pursuant to the amended Trust Agreement. The Trustees, believing the requested payment amounts to be excessive, filed for a declaratory judgment pursuant to Section 3-408 of the Courts and Judicial Proceedings Article and Maryland Rules 10-101

---

[1] It is safe to assume that Mr. Aaron removed Myrna because the Foundation would only come into existence after her death, so she could not possibly be part of the Advisory Committee. At oral argument, counsel for the Beneficiaries speculated—not unreasonably so—that Richard was removed from the Advisory Committee because he was no longer Mr. Aaron's attorney.

5

and 10-501.[2]  The parties reached a settlement, memorialized in a Settlement Agreement. The Trustees then filed in the Circuit Court for Baltimore City a "Petition to Approve Settlement and Modify Trust."  The Trustees requested the circuit court to assume jurisdiction over the Trust, approve the Settlement Agreement, and approve the Trustees' proposed restatement of the Trust Agreement (the "2016 restatement").  The intent of the proposed restatement was to simplify the original Trust Agreement and eleven amendments into one unified document that incorporated all of the changes.  One change the Trustees proposed was to remove the clause in Section 13.04 containing the language "[i]f my wife survives me, this distribution [to the Foundation] shall lapse and the property subject to

---

[2] Section 3-408 of the Maryland Code Annotated, Courts and Judicial Proceedings Article, "Declaration of rights or legal relations," provides, in relevant part:

> Any person interested as or through a personal representative, trustee, guardian or other fiduciary, creditor, devisee, legatee, heir, next of kin, or beneficiary of a trust, in the administration of a trust, or of the estate of a decedent, a minor, a disabled person, or an insolvent, may have a declaration of rights or legal relations in respect to the trust or the estate of the decedent, minor, disabled person, or insolvent in order to:
>
> * * *
>
> (2) Direct the personal representative, guardian, or other fiduciary or trustees to do or abstain from doing any particular act in their fiduciary capacity; or
> (3) Determine any question arising in the administration of the estate or trust, including questions of construction of wills and other writings.

Md. Code Ann., Cts. & Jud. Proc. § 3-408 (2017).  Maryland Rule 10-101 states, in pertinent part:

> (a) Applicability.  Except as otherwise provided by law, the rules in this Title apply to proceedings concerning:
>
> * * *
>
> (3) a fiduciary estate[.]

Maryland Rule 10-501(a) provides:

> (a) Who may file.  A fiduciary or other interested person may file a petition requesting a court to assume jurisdiction over a fiduciary estate other than a guardianship of the property of a minor or disabled person.

this distribution shall instead be distributed under the other provisions of this agreement." The Trustees reasoned that, upon Eileen's death in November 2012, the provision became unnecessary.

On August 26, 2015, the circuit court issued a Show Cause Order directing the Beneficiaries to show cause why the petition should not be granted. At issue were three contentions raised by the Beneficiaries that are not relevant to this appeal. Then, on February 4, 2016, the Beneficiaries filed a Supplemental Response disputing the propriety of removing the "if my wife survives me" clause in Section 13.04. The Beneficiaries contended that a bequest providing for the creation of the Foundation had lapsed because, they argued, the term "my wife" referred not to Eileen but rather to Mr. Aaron's second wife, Myrna.

After a hearing, the Honorable Althea M. Handy, ruling from the bench, granted the relief requested by the Trustees and approved the 2016 restatement. The court, reasoning that "once Ms. Eileen Aaron passed away[,] . . . that was the critical date," agreed with the Trustees that the reference to "my wife" in Section 13.04 of the Trust Agreement did not transfer automatically from Mr. Aaron's first wife, Eileen, to his second wife, Myrna.

The Beneficiaries noted an appeal. The sole issue before the Court of Special Appeals, as it is here, was whether the circuit court had erred in approving the 2016 restatement and declaring, in particular, that the words "my wife" in Section 13.04 of the Trust Agreement refer to Eileen, not Myrna.

The Court of Special Appeals affirmed the judgment of the circuit court. In a soundly reasoned, unreported opinion, the Honorable James R. Eyler, writing for the panel,

7

held that the words "my wife" referred to Eileen; therefore, the distribution to the Foundation did not lapse. *In the Matter of the Albert G. Aaron Living Trust*, No. 253, slip op. at 4 (Md. Ct. Spec. App. Apr. 14, 2017). We agree with the panel's reasoning and affirm the holding of the Court of Special Appeals.

Additional facts will be supplied as necessary in the sections below.

## II.

## Standard of Review

"It is axiomatic that the intention of the settlor governs the interpretation of a trust agreement." *Brent v. State of Md. Cent. Collection Unit*, 311 Md. 626, 631 (1988). The interpretation of a trust, like a will, is a legal determination, and we review *de novo* the lower court's decision. *Vito v. Grueff*, 453 Md. 88, 106 (2017); *Pfeufer v. Cyphers*, 397 Md. 643, 648 (2007). Therefore, we determine whether the circuit court was "legally correct." *Schisler v. State*, 394 Md. 519, 535 (2006); *Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 72 (2004).[3]

---

[3] The Trustees do not contest that, in general, the standard of review in trust construction cases is *de novo*. Here, however, they assert that the Trust Agreement authorized the Trustees (as Trust Advisors) to "[c]orrect ambiguities, including scrivener errors, that might otherwise require court construction or reformation." The Trustees cite the *Restatement (Third) of Property*, which declares that "if the donative document grants the fiduciary . . . authority to resolve questions of construction and provides that the fiduciary's decision shall be binding on all interested parties[,] . . . the clause does not make the fiduciary's decision controlling *but does entitle it to a strong presumption of correctness that is to be set aside only if it is arbitrary or made in bad faith*." *Restatement (Third) of Prop.: Wills & Donative Transfers* § 11.2(e) (Am. Law. Inst. 2003) (emphasis added).

The Trustees do not cite any case in which a Maryland court specifically adopted, let alone approvingly cited, § 11.2 of the Third Restatement. We need not decide that issue here.

8

## III.

## Discussion

### A. *The Parties' Contentions*

Neither party in this case advocates for a rule of law regarding trust construction that has not already been articulated by this Court. Rather, the Beneficiaries and the Trustees agree that the intent of the settlor controls the disposition of a trust. They disagree, however, as to what Mr. Aaron's intent was. In particular, the parties interpret differently the effects of Mr. Aaron's amendments to the Trust as they pertain to the meaning of "my wife" in Section 13.04.

The thrust of the Beneficiaries' argument is that Mr. Aaron's clear intent "was to assure that his direct decedents [*sic*] had sufficient funds for their future." They argue that if Mr. Aaron's "wife" (whomever she may be, past or current) died before Mr. Aaron, she would not require any distributions from the corpus of the Trust. Thus, absent those distributions to the wife, the Trust would contain sufficient assets for both Mr. Aaron's descendants and the Foundation, so the Foundation could validly be created.

The Beneficiaries further maintain that if Mr. Aaron's wife survived him, he intended to provide funds for her to live comfortably for the rest of her life. The Beneficiaries reason that with a living wife receiving regular distributions, less funds would be available for Mr. Aaron's descendants. Therefore, as the Beneficiaries see it, because significant amounts of money—money that would have otherwise been used to create and sustain the Foundation—were now going to his surviving wife, in keeping with Mr. Aaron's intent, the Foundation would not be created, thereby preserving adequate funding

9

for his descendants.  Mr. Aaron's wife, Myrna, survived him.  Therefore, according to the Beneficiaries, the distribution to the Foundation should lapse and available funds should be used to provide support to Myrna and, eventually, Mr. Aaron's descendants.

In support of their argument, the Beneficiaries offer a lengthy recitation of secondary material and case law, some from other jurisdictions, purporting to synthesize the majority view of trust construction.  Essentially, the Beneficiaries set forth the following general tenets to support their interpretation of Mr. Aaron's intent.

First, relying on two American Law Reports annotations and *Lavender v. Rosenheim*, 110 Md. 150 (1909), the Beneficiaries assert that a trust or will referring to a spouse is ordinarily presumed to mean the spouse at the time the instrument was executed, but courts must take into account all provisions of the instrument and the surrounding circumstances to determine a settlor's intent.  The Beneficiaries read Mr. Aaron's references to Myrna in the Eleventh Amendment as indications that, at the time the Amendment was executed, he knew that his wife was Myrna, and that those references are enough to overcome the presumption extant at the time the Trust was originally executed.

Second, the Beneficiaries posit that a former spouse is distinguishable from a surviving spouse.  They cite *Wright v. State*, 198 Md. 163, 171 (1951), for the proposition that a marriage presumptively lasts until it is terminated by death, annulment, or divorce.  They also cite *In re Atwood's Trust*, 114 N.W.2d 284 (Minn. 1962), a Minnesota Supreme Court case in which the court stated that "[a] divorced husband or wife is a former spouse and cannot be a surviving spouse." *Id.* at 288.  Though not explicitly stated, the Beneficiaries apparently wish to convey that because Eileen died and Mr. Aaron remarried,

10

her marriage to Mr. Aaron was terminated, and, thus, she could not properly be referred to as his wife.

Third, the Beneficiaries submit that all language in a trust instrument must be given effect, including modifications or amendments; and, when a conflict exists between two provisions, they should be reconciled to give meaning to every part of each. If that is not possible, the provision adopted later in time that expresses the testator's or settlor's intent should control. The Beneficiaries cite cases from various of our sister states that, according to the Beneficiaries, establish that courts "have given effect to modifications of trusts that changed the identities of beneficiaries or parties."

Fourth, citing the *Restatement (Third) of Property*, the Beneficiaries claim that a settlor's specific intent and general dispositive plan to provide for a surviving spouse and family members should be preferred over a contingent charitable beneficiary. The Beneficiaries argue that Mr. Aaron's "general or overall dispositive scheme" was to provide for his family members if Myrna survived him, and that such a construction comports with the preference of the *Restatement* to "favor[] family members over non-family members." *Restatement (Third) of Property*, § 11.3(c)(3). Fifth and finally, the Beneficiaries recite the proposition that trusts that are indefinite as to beneficiaries should be declared void and ask us to declare the Trust invalid in part.

Pointing to the terms of the trust instrument and the subsequent amendments thereto, the Beneficiaries insist that Mr. Aaron's overarching intent was to provide for his surviving spouse and family members. Otherwise, Mr. Aaron would not have structured the Trust such that the distribution to the Foundation would lapse if both his spouse and family

11

members were still alive. As applied to the facts of this case, the Beneficiaries argue, the principles summarized above establish that construing the term "wife" as referring to Myrna is the only construction that comports with Mr. Aaron's intent. The Beneficiaries offer Mr. Aaron's repeated references to Myrna in the Eleventh Amendment as evidence that he intended to provide for her—his wife—*and* his descendants; if Myrna was still living at the time of his death, adequate funds might not be available for his descendants.

The Beneficiaries further argue that the record contains no evidence that Mr. Aaron was facing imminent death. They therefore challenge as unsupported by the record the Trustees' inference of his intent from the "virtual certainty" that he would die before Myrna. Finally, the Beneficiaries contend that this Court should "opt for the construction of the phrase that accords with the Settlor's general or overall dispositive scheme and/or the one that favors family members over non-family members." If those arguments fail, the Beneficiaries would have us hold that the Trust is invalid in part for indefiniteness as to a beneficiary or beneficiaries.

The Trustees counter that the Court of Special Appeals correctly focused on Mr. Aaron's *expressed* intent—the definition of "my wife" contained in Article Two, which Mr. Aaron never amended—rather than, as the Trustees characterize it, the intent that the Beneficiaries merely infer from the structure of the Trust. The plain language of the Trust Agreement, the Trustees insist, controls the disposition of this case. The Trustees also point to the Eleventh Amendment, in which Mr. Aaron referred to Myrna by name on several occasions. When he did use the word "wife," he never did so without specifying Eileen or Myrna. Such a distinction is evidence that when Mr. Aaron wanted to refer to

Myrna, he did so specifically and with qualification. Because he never altered the term "my wife" in Section 13.04, the definition in Article Two continues to apply.

The Trustees note as well that, in the Eleventh Amendment, Mr. Aaron changed the makeup of the Advisory Committee. The Trustees contend that this change, coupled with the "virtual certainty" that Myrna would survive him, would make no sense if Mr. Aaron did not intend for the Foundation to exist. And, according to the Trustees, Mr. Aaron took care to emphasize the importance of his charitable objectives through the Trust Agreement.

As characterized by the Trustees, the Beneficiaries' entire argument is that under the common law, a testator's spouse is presumed to be the spouse at the time of execution, but a party can rebut that presumption by presenting evidence of a contrary intent. And because the Beneficiaries have presented no evidence of such an intent, offering speculation at best, the Trustees assert that a holding in their favor is required.

B. *Analysis*

As did the Court of Special Appeals, we begin by reciting the well-settled rules governing the construction of a trust. The process of construing a trust instrument follows the same rules as construing a will. *Vito*, 453 Md. at 106; Bogert et al., *The Law of Trusts and Trustees*, ch. 11, § 182 (3d rev. ed. 2017); *see also Restatement (Third) of Trusts* § 4 cmt. d (Am. Law. Inst. 2003). Accordingly, the "paramount concern of the court" in interpreting a trust, as with interpreting a will, "is to ascertain and effectuate the [settlor's] expressed intent." *Pfeufer v. Cyphers*, 397 Md. 643, 649 (2007) (quoting *Emmert v. Hearn*, 309 Md. 19, 23 (1987)). "This expressed intention must be gathered from the language of

13

the entire [trust], particularly from the clause in dispute, read in the light of the surrounding circumstances" at the time the trust was created. *Leroy v. Kirk*, 262 Md. 276, 280 (1971).

Ordinarily, a settlor's intent is discerned from within the four corners of the trust agreement, and language is given its plain and ordinary meaning. *Emmert*, 309 Md. at 23. Where possible, and in accord with the objects and purposes of the trust, all of the language in a trust agreement should be given effect. *First Nat'l Bank of Md. v. Dep't of Health & Mental Hygiene*, 284 Md. 720, 728–29 (1979) (citing *Vickery v. Md. Tr. Co.*, 188 Md. 178, 188 (1947)); *McCrory Stores Corp. v. Bennett*, 159 Md. 568, 573 (1930).

We agree with the Trustees that the phrase "my wife" in Section 13.04 refers to Eileen rather than Myrna. Therefore, in their proposed 2016 restatement of the Trust, the Trustees appropriately revised that section to remove as unnecessary the portion at issue—"if my wife survives me, this distribution shall lapse"—because Eileen's death immediately rendered that contingency provision unnecessary.

The starting point for our analysis is the phrase "my wife" and its accompanying definition in Article Two, both found within the four corners of the document. It is beyond dispute that at the time Mr. Aaron first executed the Trust Agreement, "my wife" explicitly meant Eileen. The language is clear: Article Two provides, "I am married to Eileen Aaron. Any reference in this agreement to 'my wife' is a reference to Eileen Aaron." Through eleven amendments—the last of which occurred after both Eileen's death and Mr. Aaron's remarriage to Myrna—this definition was never amended.

As described above, Mr. Aaron made several important changes in the Eleventh Amendment. In none of the changes did he use the phrase "my wife" without making a

14

further qualification about whom he meant. He amended Section 6.01 to add that "[t]he Jaguar is conveyed to Myrna Kaplan Aaron, my current wife." He altered Section 6.04, stating that "Section 6.04 originally intended to be relevant for provisions of my past deceased wife, Eileen Aaron, shall now be intended to be for my current wife, Myrna Kaplan Aaron." Further, in the First Amendment, Mr. Aaron had provided that certain sections in Article Seven were to be deleted if his spouse, then Eileen, survived him. In the Eleventh Amendment, Mr. Aaron specifically revoked those deletions, instructing instead that the provisions in Article Seven "shall apply to Myrna Kaplan Aaron." Section 6.04 was also modified to substantially increase the amount to be allocated to the Marital Deduction Trust—from $2 million to $8 million—and designated the Marital Deduction Trust as the primary source of distributions to Myrna. He also amended Section 6.06, which dealt exclusively with the use and distribution of certain residential properties, stating in part that "[i]f Myrna Kaplan Aaron should predecease me, this distribution shall lapse[.]" In numerous other clauses in the Eleventh Amendment, Mr. Aaron referred specifically to Myrna only by name.

Other textual evidence in the Trust Agreement convinces us that Mr. Aaron intended for the Foundation eventually to come into being. When viewing the Trust Agreement as a whole, there are signals that Mr. Aaron believed strongly in fulfilling a charitable objective. Section 6.11 of the original Trust Agreement, for example, provided that "[u]ntil the establishment of the Aaron Family Foundation in accordance with Section 13.04, I authorize my Trustee to make regular charitable donations in his discretion," and further

15

mandated that the Trustee make annual distributions to four named charities. In Article Sixteen of the original Trust Agreement, Mr. Aaron provided the following:

> If at any time there is no person or entity qualified to receive final distribution of my trust estate or any part of it, I direct that the portion of my trust estate with respect to which the failure of qualified recipients has occurred be distributed to the Aaron Family Foundation established in Section 13.04.

Put differently, the Foundation was designated as the contingent beneficiary of any or all trust assets in the event that Mr. Aaron had no living descendants.[4]

In addition, in the First Amendment, Mr. Aaron designated his only child, Jonathan Aaron, as the "principal administrative officer of the Foundation" and listed the charities to which distributions were mandatory, with the others being discretionary. The Beneficiaries urge that Mr. Aaron planned for the contingency that he might outlive Myrna, and thus, in light of the changes in the Eleventh Amendment, Mr. Aaron must have been referring to Myrna. Mr. Aaron, though, explicitly acknowledged in the First Amendment that when he created the Trust, he "made the assumption that [he] would survive Eileen" because she had been dealing with "stage 4 Lung Cancer for more than nine years." He therefore added contingent provisions, some of which were revoked in later amendments, addressing what would happen in the event that Eileen survived him and then contested the terms of the Trust after his death. Such a recognition is evidence that Mr. Aaron was aware of, and knew how to plan for, contingencies related to survivorship. Given Mr. Aaron's other changes in the Eleventh Amendment, in which he specifically named Myrna and

---

[4] The Trustees submit that the language in Article Sixteen presents a problem—that if Mr. Aaron died without descendants and the Foundation ceased to come into existence, part of the estate would fall into intestacy. We discuss this issue below.

16

substituted her for Eileen on multiple occasions, it would be unreasonable to infer an intent to change the meaning of a term defined elsewhere. Mr. Aaron easily could have made a similar substitution to the provision at issue in Section 13.04, but he did not.

Finally, Mr. Aaron's change to the composition of the Advisory Committee in the Eleventh Amendment comports with an intent to establish the Foundation. Put simply, given his health and the slim possibility that he would survive Myrna, Mr. Aaron would have had little reason to amend the membership of the Advisory Committee if he did not wish for there ever to be an Advisory Committee. Indeed, at a hearing in the circuit court, counsel for the Beneficiaries conceded that it was a "virtual certainty" that Mr. Aaron would predecease Myrna.

All of these textual clues indicate not only that the words "my wife" retained their express definition from Article Two, but also that Mr. Aaron specifically amended the Trust in this manner to provide for Myrna (his "current wife") and his descendants while still maintaining adequate funds for the eventual creation of the Foundation. If Mr. Aaron intended for certain funds otherwise earmarked for the Foundation to go to a wife who outlived him, it would make little sense for him to increase drastically the distributions she was to receive, specifically qualify that she was his "current wife" without modifying the definition of "my wife" in Article Two, and remove her from an Advisory Committee on which she would have been, by definition, unable to serve.

Beyond the evidence of Mr. Aaron's intent in the Trust Agreement and relevant amendments, we find further support for the Trustees' position in Maryland case law, though our cases addressing this subject are few and far between. The common law

17

recognizes a presumption, which both parties acknowledge, that a spouse referred to in a trust or will is the spouse at the time of execution of the instrument. *See* 4 Page, *The Law of Wills* §§ 34.2, 34.3 (Rev. 2004 & Supp. 2017); C. R. McCorkle, Annotation, *Person Entitled to Devise or Bequest to "Husband," "Wife," or "Widow,"* 75 A.L.R.2d 1413 (1961). In *Estep v. Mackey*, 52 Md. 592 (1879), a testator divided in a bequest most of his estate equally among his three illegitimate children. *Id.* at 595. If one child died without heirs, the estate was to be divided between the remaining two children; if two children died without heirs, the estate should pass to the surviving child; and if all three children died without heirs, the testator's brother and sister would inherit the remainder of the estate. *Id.* at 595, 597. One of the children, Henry Clay Cross, died without heirs after the will was executed, and another son bearing the same name was born. *Id.* at 597. The second Henry Clay Cross made a claim to the portion of the estate originally meant for the first son of the same name. *Id.*

This Court declared in *Estep* that a testator's intent "must clearly appear from the language used in the various parts of the will; and, unless the intent is clearly and certainly different from that which the technical language he has used may import, we must adhere to their technical signification, and give effect to the will accordingly." *Id.* at 598. Because the second Henry Clay Cross "was not in being and could not have been intended," he could not take under the will. *Id.* at 597. No amendments existed in *Estep* as they do here, but the reasoning of *Estep* applies nonetheless. When Mr. Aaron created Section 13.04, he could not have intended to refer to Myrna because she was not yet his wife. No modification to the provision at issue having been made thereafter, it cannot be said that

18

he intended to refer to a separate person, Myrna, simply because she eventually came to be his wife.

Though not squarely on point, this Court's decision in *Lavender v. Rosenheim*, 110 Md. 150 (1909), provides an important guidepost. The testatrix in *Lavender*, Elizabeth Whalen, provided in her will that all of her estate should be devised in trust to Benjamin Rosenheim for the benefit of her son, Oliver Whalen, during Oliver's life. When Oliver died, the corpus of the estate would be distributed to Oliver's "child or children" who survived him. *Id.* at 151. If Oliver died without a surviving child, however, the testatrix directed payment to certain nieces and nephews, and then provided, "I give, devise and bequeath all the rest and residue of my estate, after the payment of the above-mentioned legacies, unto the wife of my said son, Oliver R. Whalen, absolutely." *Id.* When the will was created, Oliver was married to Mary Whalen, who "knew [Elizabeth]; lived in the same house with her, and was present at [the] time [Elizabeth] made her will." *Id.* at 152.

Elizabeth Whalen then died. A few years later, Oliver and Mary divorced, and Mary married Frank Lavender. Oliver then died without children or remarrying. The trustee under the will sought direction from the court as to how to distribute the estate. *Id.* Relying in part on *Estep*, this Court decided that Oliver's former wife, Mary, was entitled to the estate because the will did not express an intent that Mary had to be Oliver's wife on the date of Oliver's death. *Id.* at 157–59. In so holding, we recited the following rule from a then-leading English wills treatise:

> First, that a devise or bequest to the wife of A. who has a wife at the date of the will relates to that person, notwithstanding any change of circumstances which may render the description inapplicable at a subsequent period . . . ;

19

but that, secondly, if A. have no wife at the date of the will, the gift embraces the individual sustaining that character at the death of the testator; and, thirdly, if there be no such person, either at the date of the will or at the death of the testator, it applies to the woman who shall first answer the description of wife at any subsequent period.

*Id.* at 157–58 (citing 1 Jarman, *A Treatise on Wills* 285 (1844)).

As the Trustees concede, *Lavender* is distinguishable from the case at bar because Oliver died without heirs or a spouse, and thus Mrs. Whalen otherwise would have died intestate. The Court, recognizing "the abhorrence of [c]ourts to intestacy," based its holding, at least in part, upon its desire to avoid a result involving intestacy. *Id.* at 153. But the teachings of *Lavender* are not entirely inapposite. Mr. Aaron did not identify any distant relatives, so if Mr. Aaron's living descendants all died without heirs, a substantial portion of the corpus of the Trust would fall into intestacy—a result that Mr. Aaron could not possibly have intended.

As the Beneficiaries have argued, if a will and codicil (or a trust and amendment) stand in conflict, the codicil or amendment controls because it contains the most recent expression of a testator's or settlor's intent. *Wiesenfeld v. Rosenfeld*, 170 Md. 63, 70 (1936). The Eleventh Amendment memorialized that standard, providing that "[a]ny conflict between what is contained in my Living Trust and what is contained in this Eleventh Amendment to my Living Trust will be resolved in favor of this document." The Eleventh Amendment also included a prefatory phrase before the list of substantive changes: "Irrespective of any other provisions of this Living Trust and its prior Ten Amendments, I declare the following . . . [.]" The Beneficiaries take this language and attempt to run with it, arguing that the conflict between the definition of "my wife" in

20

Article Two and Mr. Aaron's reference to Myrna as his "current wife" in the Eleventh Amendment cannot be reconciled.

The problem with the Beneficiaries' argument is that the two instruments need not be read in conflict with one another. In *Jones v. Holloway*, 183 Md. 40 (1944), we repeated the "established rule in this State that a will and codicil are to be construed together as one instrument and *reconciled as far as practicable*." *Id.* at 45 (emphasis added). The *Holloway* Court continued:

> It is also a settled rule in Maryland that when a certain term appears in a will more than once, the Court will infer that the testator intended the term to have the same meaning wherever used, unless a contrary intention clearly appears from the context. If the testator has used words in one part of his will in a way that clearly indicates his own understanding of their import, whether or not it differs from their ordinary or legal meaning, there can be no safer way to ascertain his purpose than to give to the same words when they appear elsewhere in the will the same meaning that he attached to them in the instance where his understanding of them is apparent, except when a different purpose in their use is disclosed.

*Id.* It does not take a stretch of the imagination to read Article Two and the Eleventh Amendment in harmony. As mentioned, when Mr. Aaron referred to Myrna in the Eleventh Amendment, he did so by name, and he never used the phrase "my wife" in isolation.

This conclusion is further supported by *Johns Hopkins University v. Pinckney*, 55 Md. 365 (1881). There, the testator created a will that directed the executors of his estate to invest $10,000 and distribute annually to Ms. Pinckney the income from the investment. *Id.* at 366–67. Thereafter, the testator made a codicil bequeathing "any other personalty of which I am possessed" to the trustees of Johns Hopkins University. *Id.* at 380. In support

of its holding that the codicil did not revoke the bequest to Ms. Pinckney, the Court of Appeals stated the following rules:

> 1st. That the codicil does not operate as a revocation of a devise or bequest in a will, unless there is an express clause of revocation, or unless the provisions in the codicil, are so inconsistent with the will, that the two cannot stand together.
> 2nd. If revocation is to be implied from inconsistent provisions, it will be limited to such provisions of the will, as are plainly inconsistent with the codicil.
> 3rd. Where the devise or bequest in the will, is clear and free from doubt, the intention to revoke by the codicil, must be equally clear and explicit.

*Id.* at 380–81. By analogy, we see no clear intention to change the nature of the charitable gift to the Foundation, a contingent beneficiary. Therefore, absent other express or implicit signs that Mr. Aaron intended the phrase "my wife" to change meaning from Eileen to Myrna, *Holloway* and *Pinckney* together compel the conclusion that its meaning remained the same.

The Beneficiaries' reading also presents a dilemma that is at odds with the holding of *Pinckney*: if "my wife" is merely a guideline and Myrna had predeceased Mr. Aaron and he remarried, it might be said that the provision containing "[i]f my wife survives me" was somehow resurrected to apply to the new wife. Without any clarification or other sign of intent, the presumption that Mr. Aaron intended to refer to his wife at the time of execution cannot be overridden. Moreover, the cases cited by the Beneficiaries are unhelpful in ascertaining Mr. Aaron's intent. The discussion of the meaning of the word "wife" in *Wright v. State*, 198 Md. 163 (1951), centered on the validity of a divorce in a criminal bigamy case. *In re Atwood's Trust*, 114 N.W.2d 284 (Minn. 1962), involved a

22

trust in which the settlor did not define the word "wife." None of the other cases upon which the Beneficiaries rely provide support for their argument that, where a settlor expressly defines the term "my wife," and in the absence of other evidence, the meaning of the word "wife" automatically changes if a settlor remarries.

In light of this precedent, nothing in the record convinces us that Mr. Aaron intended to refer to Myrna with the unmodified phrase "my wife" in Section 13.04. In their reply brief in this Court, the Beneficiaries admonish us not to focus, as they believe the Court of Special Appeals did, on a single, solitary sentence at the beginning of the Trust Agreement, especially without considering the surrounding circumstances and subsequent modifications to the Trust. As the Court of Special Appeals explained, however, Article Two is merely the "clearest expression" of Mr. Aaron's intent, and, when viewed in light of the other changes he made—for instance, his practice of repeatedly clarifying to whom he was referring in the Eleventh Amendment—it becomes clear that "my wife" meant Eileen, and Eileen alone.

Even if we were to accept the Beneficiaries' argument that Mr. Aaron's overwhelming intent was to provide adequately for his descendants, and that providing for both a living wife *and* the Family Foundation would undermine that intent, the Beneficiaries still must demonstrate that Mr. Aaron meant *any* living wife rather than Eileen specifically. The Beneficiaries have not done so, especially given the express definition in Article Two and evidence of his intent derived from the substantial provisions made for Myrna elsewhere in the Trust Agreement.

23

## IV.

## Conclusion

For the reasons stated above, we hold that Mr. Aaron expressed a reasonably clear intention that the phrase "my wife" as used in Section 13.04 referred to his first wife, Eileen, rather than his second wife, Myrna. As such, the distribution to the Foundation did not lapse, and the circuit court correctly accepted the Trustees' proposed restatement of the Trust with respect to that issue. Accordingly, we affirm.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**